## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

                                   Case No. 15-40054-01-DDC

WESLEY LAVERN HARRIS (01),

     Defendant.

---

## MEMORANDUM AND ORDER

This matter comes before the court on Wesley LaVern Harris's Motion to Reduce Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 158).  The government filed a Response (Doc. 161).  And Mr. Harris replied.  Doc. 162.  The court dismisses Mr. Harris's motion due to lack of subject matter jurisdiction.  In explaining its reasoning, the court revisits its reading of 18 U.S.C. § 3582(c)(1)(A) and the growing body of caselaw governing it.  Specifically, the court explains its conclusions that § 3582(c)(1)(A) is jurisdictional and that the statute's "lapse of 30 days" language imposes more than a mere waiting period.

### I.     Background

On August 19, 2015, Mr. Harris entered a guilty plea to one count of carjacking violating 18 U.S.C. § 2119 and one count of interference with commerce by means of robbery, a crime commonly known as Hobbs Act robbery, violating 18 U.S.C. § 1951(a).  Doc. 37; Doc. 38 at 1 (Plea Agreement).  In March 2016, this court sentenced him to 86 months' imprisonment.  Doc. 75 at 2.  He is serving that sentence at USP Florence-High and is set for release on July 31, 2021.

*See* Wesley L. Harris, Register No. 24859-031, https://www.bop.gov/inmateloc/ (last visited Dec. 3, 2020).

On August 24, 2020, Mr. Harris filed a motion to modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) due to the COVID-19 pandemic.  Doc. 158 at 1.  The court must dismiss Mr. Harris's motion because it lacks subject matter jurisdiction.

## II.    Legal Standard

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute[.]"  *United States v. James*, 728 F. App'x 818, 822 (10th Cir. 2018) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal quotation marks omitted)).  "After entry of final judgment, a district court has jurisdiction only to the extent permitted by statute or rule."  *Id.*

Title 18 U.S.C. § 3582(c) announces a general rule that the "court may not modify a term of imprisonment once it has been imposed[.]"  But the statute also recognizes certain exceptions. Even after it has imposed a term of imprisonment, the sentencing court may modify that term "upon motion of the defendant after [1] the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [2] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A).  This statute "also requires that the inmate present 'extraordinary and compelling reasons' justifying the relief."  *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)).

The court is now convinced that our Circuit views this statute as jurisdictional.  "Unless the basis for resentencing falls within one of the specific categories authorized by section 3582(c), the district court lack[s] jurisdiction to consider [the defendant's] request."  *United*

*States v. Brown*, 556 F.3d 1108, 1113 (10th Cir. 2009) (quotations omitted); *see also United States v. Saldana*, 807 F. App'x 816, 820 (10th Cir. 2020) (applying *Brown* to defendant's motion under § 3582(c)(1)(A) and holding that the district court lacked jurisdiction to consider the motion where defendant was "unable to show that he satisfies one of the specific categories authorized by" § 3582(c) (citation and internal quotation marks omitted)).

But many sources disagree with the Circuit's view of § 3582(c). Then-Judge Gorsuch dissented in *United States v. Spaulding* to articulate a non-jurisdictional view of § 3582(c). *See* 802 F.3d 1110, 1130–34 (10th Cir. 2015) (Gorsuch, J., dissenting). Outside the Tenth Circuit, other Circuits have embraced that position. *See, e.g.*, *United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *1 (7th Cir. 2020) (Easterbrook, J.) (noting, in the context of a § 3582(c)(1)(A) motion, that failure to exhaust administrative remedies "is an affirmative defense, not a jurisdictional issue" (citations omitted)); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) (holding that defendant's "failure to satisfy this administrative exhaustion requirement does not deprive [the court] of subject-matter jurisdiction"). Indeed, in prior Orders, the court has explained the appeal of these views. *See, e.g.*, *United States v. Younger*, No. 16-40012-02-DDC, 2020 WL 3429490, at *3 (D. Kan. June 23, 2020).

But ultimately, the court concludes that Tenth Circuit precedent precludes their reading of the statute. *See Spaulding*, 802 F.3d at 1122 (noting that our Circuit "has already determined, as a textual matter, that the relevant provisions of § 3582(c) 'operate[ ] as a clear and mandatory restriction on a court's authority'" (quoting *United States v. McGaughy*, 670 F.3d 1149, 1158 (10th Cir. 2012))); *see also Saldana*, 807 F. App'x at 819–21. At bottom, the court is persuaded that our Circuit views the statute as jurisdictional. Its requirements are not waivable. Where a defendant moving under § 3582(c)(1)(A) fails to show that he satisfies the statute's requirements,

the court must dismiss the motion for lack of jurisdiction.  *See Spaulding*, 802 F.3d at 1122; *Saldana*, 807 F. App'x at 819–21.

### III.   Discussion

#### A.  Exhaustion or Lapse Under 18 U.S.C. § 3582(c)(1)(A)

Mr. Harris asserts that he met the statutory exhaustion requirement before he filed his motion.  Doc. 158 at 3.  An inmate seeking compassionate release under § 3582(c)(1)(A) must first "request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies."  *Springer*, 820 F. App'x at 791 (citations omitted).  The court properly may consider a defendant's motion under § 3582(c) filed after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A).

The COVID-19 pandemic has induced a flood of motions under § 3582(c), and courts evaluating the meaning of this statutory language have split.  One view concludes that "'lapse' refers to the failure of the warden to respond to defendant's request."  *United States v. McIntosh*, No. CR 11-20085-01-KHV, 2020 WL 5747921, at *2 (D. Kan. Sept. 25, 2020), *reconsideration denied*, No. CR 11-20085-01-KHV, 2020 WL 6270918 (D. Kan. Oct. 26, 2020) (first collecting cases; then citing Black's Law Dictionary 885 (7th ed. 1999) (defining "lapse" as the "termination of a right or privilege because of a failure to exercise it within some time limit or because a contingency has occurred or not occurred")).  "In other words, if the warden responds to a request within 30 days, defendant must fully exhaust available administrative appeals before filing a motion in district court."  *Id.* at *2 (citations omitted).

*McIntosh*'s reading of the statutory language is careful.  And some other district courts within our Circuit have adopted a similar view.  *United States v. Llantada*, No. CR 14-832 KG, 2020 WL 6822827, at *2 (D.N.M. Nov. 20, 2020) ("[I]f thirty days lapse from receipt of the

request by the warden of the facility where the petitioner is incarcerated with no action by the warden, a district court is empowered to consider the petitioner's Section 3582(c)(1)(A) motion."); *United States v. Manzanares*, No. 12-CR-1563-WJ, 2020 WL 6449102, at *3 (D.N.M. Nov. 3, 2020) (refusing to construe statute's 30-day "lapse" as a "waiting period"); *United States v. Cramer*, No. 2:18-CR-201-TC, 2020 WL 5531397, at *3 (D. Utah Sept. 15, 2020) (reasoning that because "more than thirty days have passed without response from the BOP, [defendant] has satisfied the exhaustion requirement").

Moreover, two Circuit Courts recently have endorsed a similar reading of the statute. *See United States v. Gunn*, ___ F.3d ___, No. 20-1959, 2020 WL 6813995, at *1 (7th Cir. Nov. 20, 2020) (Easterbrook, J.) ("[I]n 2018 the First Step Act created a judicial power to grant compassionate release on a prisoner's own request, provided that the prisoner first allowed the Bureau to review the request and make a recommendation (or it let 30 days *pass in silence*)." (emphasis added)); *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. Sept. 25, 2020) (Calabresi, J.) ("Congress allowed people seeking compassionate release to avoid BOP if BOP rejects their motions or *fails to act on them* within a short time period, only 30 days." (emphasis added)).

In contrast, courts on the other side of the split read "the lapse of 30 days" in § 3582(c)(1)(A) merely to require that defendant wait 30 days after requesting relief internally before bringing the action to court, regardless of whether the warden responds timely. *See, e.g.*, *United States v. Morris*, No. 16-20022-3, 2020 WL 5231319, at *2 (D. Kan. Sept. 2, 2020) (Robinson, C.J.) (holding that "because more than thirty days have passed since [defendant] requested compassionate release from the Warden, this Court has jurisdiction to decide his motion"). And several other Circuit Courts have adopted this view. *See United States v. Franco*,

5

973 F.3d 465, 468 (5th Cir. 2020) (explaining that "the statute permits two different routes a defendant may take before filing a motion in court" and they include "filing a motion after the BOP's denial or filing a motion 30 days after receipt by the warden"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (construing § 3582(c)(1)(A) to allow defendant to file motion 30 days "after the warden receives his request" even if the warden denied the request within 30 days); *United States v. Alam*, 960 F.3d 831, 834 (6th Cir. 2020) ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them.").

The Tenth Circuit hasn't waded into the current of this dispute, at least not yet. Our Circuit has paraphrased the statute in language that one could read to suggest that "lapse" means the mere passage of time. *See United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (paraphrasing § 3582(c)(1)(A) such that the statute would authorize a court to modify an inmate's sentence if "thirty days have passed since" the warden received the inmate's compassionate-release request). But the court concludes that *Springer* does not compel the court to adopt that view of the statute for two reasons. *First*, *Springer* is unpublished and does not bind this court. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). *Second*, *Springer* did not directly confront the question at issue here. The case considered the event that *starts* the administrative remedy process, and not what *ends* or exhausts it. *Springer* engaged in no explicit analysis of the statute's use of the term "lapse."

This fissure in the judicial landscape reveals the difficulty of the question. The court embraced previously the view that exhaustion can be met by the mere passing of 30 days. *See, e.g.*, *United States v. Dobbertin*, ___ F. Supp. 3d ___, No. 12-20139-01-DDC, 2020 WL

4365542, at *2 (D. Kan. July 30, 2020).  Since then, scores of § 3582(c)(1)(A) filings have afforded the federal courts many opportunities to consider this question.  Given recent caselaw that has developed and clarified the issue, the court concludes that the better reading of § 3582(c)(1)(A)'s text is one that understands the statute to require 30 days to pass in silence, rather than merely impose a waiting period.  In other words, if a warden lets 30 days pass without responding to an inmate's request under § 3582(c)(1)(A), the inmate may proceed directly to file a motion with the court who imposed the prison term.

In the current case, the distinction makes little difference.  Mr. Harris would satisfy either reading of the statute's lapse provision.  He has attached to his motion several documents showing that he "submitted a request to the Warden at USP Florence for compassionate release in accordance with the provisions of 18 U.S.C. § 3582(c)(1)" and that more "than 30 days have passed since the warden received Mr. Harris's request" on July 23, 2020.  *See* Doc. 158-2; Doc 158-3.  The government notes that the Warden did not respond formally to Mr. Harris's request within 30 days and concedes that Mr. Harris has met the statutory requirement of exhaustion or lapse.  *See* Doc. 161 at 8 & n.6 ("As 30 days have passed since presentation of [Mr. Harris's] letter to the Warden without a formal declination, the defendant is authorized to file his motion for consideration of compassionate release with the Court.").

Satisfied that Mr. Harris's motion shows that he has met § 3582(c)(1)(A)'s requirement of exhaustion or lapse, the court now turns to the substance of the motion.

### B.  Extraordinary and Compelling Reasons

Mr. Harris seeks to modify his sentence under § 3582(c)(1)(A).  Doc. 158 at 1.  That statute authorizes district courts to reduce a term of imprisonment if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the court finds that (i)

"extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"  18 U.S.C. § 3582(c)(1)(A).  The Sentencing Commission's applicable policy statement provides that the court may reduce a term of imprisonment, if, after considering the § 3553(a) factors, (1) "extraordinary and compelling reasons warrant the reduction,"[1] (2) "the defendant is not a danger to the safety of any other person or the community," and (3) "the reduction is consistent with this policy statement."  U.S.S.G. § 1B1.13.

Mr. Harris raises "two factors that increase the risk of severe illness and complications from COVID-19" and asserts that they are sufficiently extraordinary and compelling to satisfy § 3582(c)(1)(A).  The first is his asthma.  The second is his race, *i.e.*, he is Black.  The court now considers these conditions to determine whether they satisfy the statute.

### 1.   Whether Mr. Harris's Asthma During the COVID-19 Pandemic is "Extraordinary and Compelling"

Mr. Harris asserts that his asthma is an extraordinary and compelling reason under § 3582(c)(1)(A).  *See* Doc. 158 at 5–6.  He asserts that his "asthma is a 'serious' chronic condition—a condition 'from which [he] is not expected to recover'—which, in light of COVID-19, substantially diminishes his ability to provide self-care in prison[.]"  *Id.*  Mr. Harris asserts

---

[1]     Application Note 1 to § 1B1.13 provides that extraordinary and compelling reasons exist "under any of the [four] circumstances set forth below" in (A) through (D).  *Id.* § 1B1.13 application note 1. Subdivision (A) of Note 1 provides that the medical condition of a prisoner may qualify him for compassionate release, if (i) he is suffering from a terminal illness, or (ii) he is suffering from a serious physical or medical condition that "substantially diminishes" his ability to provide self-care within the prison and he is not expected to recover.  *Id.* § 1B1.13 application note 1(A).  Subdivisions (B) and (C) apply to age and family circumstances not invoked here.  Subdivision (D) supplies a catchall provision:  it applies when as determined by the "Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  *Id.* § 1B1.13 application note 1(D).

that he "suffers from asthma" and "has used an inhaler or breathing treatments as necessary to control the condition."  *Id.* at 6 (citing Doc. 63 at 17 (PSR § 89)).

Mr. Harris argues that the apparent relationship between asthma and COVID-19 outcomes supports his motion.  *See id.* at 6–7.  He notes that the "CDC states that asthma may increase risk from COVID-19."  *Id.* at 6 & n.1 (citing CDC, People with Certain Underlying Medical Conditions (updated July 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html).  But the current version of the CDC's guidance is more precise.  It limits the CDC's warnings about asthma to "moderate-to-severe" asthma.  *See* CDC, People with Certain Medical Conditions (updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 3, 2020).  The agency guides that "moderate-to-severe asthma *might* increase your risk for severe illness from COVID-19."  *Id.* (emphasis added); *see also* CDC, People with Moderate to Severe Asthma (updated Nov. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Dec. 3, 2020).  Recently, the CDC noted the existence of "mixed evidence" about the relationship between asthma and severe illness from COVID-19.  *See* CDC, Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19 (updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited Dec. 3, 2020).  "Mixed evidence" means that there are "multiple studies that reached different conclusions about risk associated with a condition[.]"  *Id.*  Given the CDC's more recent analysis of multiple studies, the court is inclined to give greater weight to the CDC's current guidance than these individual studies and news articles cited by Mr. Harris.  *See* Doc. 158 at 7.

9

Here, Mr. Harris does not establish that his asthma condition is moderate or severe. Indeed, he does not even claim that his asthma is "moderate" or "severe." *See generally* Doc. 158; *cf.* Doc. 162 at 3 ("a history of asthma"). Without such a showing, neither the CDC's guidance nor the cases that Mr. Harris cites support a conclusion that *his* asthma condition is the sort of medical condition qualifying as "extraordinary and compelling" under § 3582(c)(1)(A).

Mr. Harris asserts that he has had asthma since birth. Doc. 158-3 at 1–2. He also alleges that he has used an inhaler. Doc. 158 at 6 (citing Doc. 63 at 17 (PSR § 89)). But he provides no evidence to support his assertions about the current state of his asthma condition. The government points out that a "review of the defendant's Bureau of Prisons medical records makes absolutely no mention of the defendant suffering from asthma." Doc. 161 at 15. And as recently as June 3, 2020, Mr. Harris "denied any issues related to asthma or breathing in general." *Id.* (citing BOP Assessment of Wesley L. Harris (June 3, 2020) ("Inmate denies: shortness of breath; breathing difficulties; any respiratory issues . . . .")).

Defendant cites several cases to support his claim that asthma is an extraordinary and compelling reason under § 3582(c)(1)(A). *See* Doc. 158 at 7; Doc. 162 at 3 & n.7. Nearly every one of Mr. Harris's cases differs factually from his. Moreover, a survey of asthma cases from our court weighs against concluding that Mr. Harris's condition qualifies as "extraordinary and compelling" under § 3582(c)(1)(A). Below, the court first considers the cases Mr. Harris cites, and then considers other similar cases from this court and sibling courts within our Circuit.

### a.  Asthma Cases Cited by Mr. Harris

Mr. Harris's cases do not support the assertion that *his* asthma condition qualifies as "extraordinary and compelling" under § 3582(c)(1)(A). In *United States v. Hernandez*, our court granted defendant's unopposed motion for compassionate release because of his asthma

condition.  Mem. and Order, *United States v. Hernandez*, No. 19-cr-40011-01-HLT, Doc. 55 at 1

(D. Kan. Aug. 19, 2020) ECF 55 at 1.  But, in contrast to its position in this case, the government

in *Hernandez* agreed that defendant's health condition qualified under § 3582(c)(1)(A).  *Id.*

Similarly in *United States v. Gileno*, 455 F. Supp. 3d 1, 2–4 (D. Conn. 2020), the government did

not oppose defendant's motion for compassionate release due to documented "chronic asthma

and other respiratory issues[,]" including "'hyperactive airway disease'" and "multiple bouts of

pneumonia as an adult."  And the government took a similar position in *United States v.*

*Echevarria*, No. 317CR44MPSMPS, 2020 WL 2113604, at *1–2 (D. Conn. May 4, 2020)

(noting that "the Government stated that it did not oppose a reduction of [defendant's] sentence

to time served, in light of [defendant's] asthma—as corroborated by his medical records").  In

short, the current case differs from the unopposed motions in *Hernandez*, *Gileno*, and *Echevarria*

because the parties here dispute whether Mr. Harris's medical condition qualifies under the

statute.  *See* Doc. 161 at 15.

The other cases that Mr. Harris cites involved substantially different facts.  The

defendants' conditions were more severe or their access to medicine was more limited.  In

*United States v. Lee*, the court concluded that defendant met "his burden to show that he suffers

from moderate to severe asthma" and noted that "the government does not dispute that moderate

to severe asthma is a recognized risk factor."  *United States v. Lee*, 445 F. Supp. 3d 272, 274

(N.D. Cal. 2020).  The defendant asserted that he previously was hospitalized due to his asthma

condition and "experiences wheezing every day, significant shortness of breath from time to

time, and that he suffers breathing problems, shortness of breath and airway obstruction almost

every night."  *Id.* at 273.  The *Lee* defendant's "partner of 25 years . . . submitted a declaration

attesting to his history of moderate to severe asthma, and she states that the entire time she has

known him he has used an inhaler and that Lee would often have asthma attacks walking up stairs or hills." *Id.* at 274.  Moreover, the *Lee* court was "very troubled by the fact that defendant has not had access to his inhaler for the last several weeks." *Id.*  Here, Mr. Harris asserts no facts resembling the severity of asthma established in *Lee*.

In *United States v. Gorai*, the court granted defendant's motion for compassionate release because of his asthma condition.  *See* No. 218CR220JCMCWH, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020).  But *Gorai* concluded that "defendant has been unable to self-care in a BOP facility already overburdened by its COVID-19 response" because "[m]edical staff has recommended that defendant use his inhaler more than prescribed" and defendant had "not received breathing treatments to clear his lungs, despite repeated requests." *Id.*  Similarly, another court granted a motion under § 3582(c)(1)(A) where defendant "suffered from asthma since childhood" and had "not received an inhaler from the BOP in approximately two weeks," and was "in dire need of his medication." *United States v. Tran*, No. CR 08-00197-DOC, 2020 WL 1820520, at *1 (C.D. Cal. Apr. 10, 2020).  Here, Mr. Harris asserts that he has used an inhaler before but makes no allegations about lack of access to one now.  *See* Doc. 158 at 6–7.

In *United States v. Hernandez*, 451 F. Supp. 3d 301, 304 (S.D.N.Y. Apr. 2, 2020), the court granted a motion under § 3582(c) because "COVID-19 presents a heightened risk for incarcerated defendants like [defendant] with respiratory ailments such as asthma."  The court rooted its conclusion in CDC data.  *See id.* (citing CDC, People with Moderate to Severe Asthma, (Mar. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html).  Despite the CDC's distinction between those suffering moderate to severe asthma from those without it, *Hernandez* did not specify whether the defendant's asthma condition is moderate or severe, but concluded that COVID-19 presented a "heightened medical

12

risk[.]"  *Id.* at 304–05; *see also United States v. Gentille*, No. 19 CR. 590 (KPF), 2020 WL

1814158, at *4 (S.D.N.Y. Apr. 9, 2020) (relying on *Hernandez* and failing similarly to explain

precisely its application of the CDC's asthma guidance to defendant's medical condition); *United

States v. Smith*, 454 F. Supp. 3d 310, 315 (S.D.N.Y. Apr. 13, 2020) (same).  The court in *United

States v. McCarthy* granted compassionate release to an inmate with asthma, but that defendant

suffered from "well-documented and serious" lung-related ailments beyond just asthma,

including chronic obstructive pulmonary disease (COPD).  *United States v. McCarthy*, 453 F.

Supp. 3d 520, 523 (D. Conn. Apr. 8, 2020) (granting motion under § 3582(c)(1)(A)).  Unlike

asthma, COPD is on the CDC's list of conditions that puts adults at increased risk of severe

illness from the virus that causes COVID-19.  *See* CDC, People with Certain Medical Conditions

(updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html (last visited Dec. 3, 2020).

     In sum, the court's review of defendant's list of asthma cases reveals that courts granting

compassionate release on the basis of asthma conditions have done so on facts not presented

here.  These cases thus provide little support for Mr. Harris's request.

> **b.  Asthma Cases from the District of Kansas**

     In *United States v. Gilchrist*, our court held that defendant's asthma and risk of

contracting COVID-19 in prison satisfied defendant's burden to show "exceptional and

compelling reasons for a reduced sentence."  *See United States v. Gilchrist*, No. CR 12-20066-

40-KHV, 2020 WL 5408138, at *4–5 (D. Kan. Sept. 9, 2020).  *Gilchrist* concluded that

defendant "has a documented history of asthma" where his medical care provider noted that

"defendant has used a nebulizer machine and an albuterol inhaler for decades[,] . . . has had

multiple emergency room visits for asthma exacerbations and has been prescribed steroids to

avoid hospitalization." *Id.* at 5. The court also noted that "defendant has submitted a prescription for an albuterol inhaler from 2014, near the time when BOP first housed him at FCI Yazoo City, as well as a prescription for an albuterol inhaler from August of 2020" and "defendant states that he currently uses an albuterol inhaler twice daily." *Id.* Here, Mr. Harris does not provide the court with any medical documentation of his condition. *See* Doc. 158 at 6 (citing Doc. 63 at 17 (PSR ¶ 89)).

Though he does not cite it, a case more favorable to Mr. Harris's arguments about asthma is *United States v. Stewart*, No. 98-40097-01-SAC, 2020 WL 4260637, at *5 (D. Kan. July 24, 2020) (granting motion for compassionate release). In *Stewart*, defendant cited his PSR as proof of his asthma, but did "not cite nor mention receiving any institutional care and treatment for his asthma." *Id.* And defendant did "not show his asthma to be moderate or severe as to rise to a particularized risk." *Id.* This court nonetheless held that defendant's "asthma and his institutional exposure to COVID-19 qualify as extraordinary and compelling reasons" under § 3582(c)(1)(A). *Id.*

But, this court's more recent opinions have held that the defendant's asthma did not qualify as an extraordinary and compelling reason under § 3582(c)(1)(A). *See, e.g.*, *United States v. Williams*, No. 14-40094-03-DDC, 2020 WL 6059738, at *4 (D. Kan. Oct. 14, 2020) ("Even if the court assumes that before [defendant] entered prison in 2014, a health care professional diagnosed him with asthma and a heart murmur, he has not shown that he *presently* has or is receiving treatment for such conditions."); *United States, v. Lee*, No. CR 10-20128-01-KHV, 2020 WL 5993505, at *6 (D. Kan. Oct. 9, 2020) (holding that asthmatic defendant's medical conditions "do not constitute extraordinary and compelling reasons for his release"); *United States v. Stinson*, No. CR 11-20117-01-KHV, 2020 WL 5629090, at *5 (D. Kan. Sept. 21,

2020) (holding that asthmatic "defendant's medical condition, the conditions at [his BOP facility] and the ongoing COVID-19 pandemic are not 'extraordinary and compelling' reasons that warrant his release under Section 3582(c)(1)(A)").

Other courts in our circuit have similarly denied motions for compassionate release due to alleged asthma where the defendant did not show the condition was moderate or severe. *See e.g.*, *United States v. Hemmelgarn*, No. 1:18-CR-00069-3, 2020 WL 5645316, at *1–2 (D. Utah Sept. 22, 2020) (denying defendant's motion to reconsider court's denial of prior motion for compassionate release and concluding that "no extraordinary or compelling reason exists" where defendant asserts "mild asthma"); *United States v. Wadley*, No. 2:18-CR-00408-DAK, 2020 WL 3270880, at *2 (D. Utah June 17, 2020) (concluding that defendant "failed to establish[ ] extraordinary and compelling reasons to warrant the relief he seeks in this case" where "although Defendant suffers from asthma his medical records do not indicate that his asthma is moderate or severe, which is the standard articulated by the Center for Disease Control and Prevention as placing individuals at higher risk of complications from COVID-19."); *see also United States v. Edington*, No. 19-CR-00174-REB-1, 2020 WL 2744140, at *3 (D. Colo. May 27, 2020) (denying motion under § 3582(c)(1)(A) where defendant's "claim that she suffers from asthma is wholly unsubstantiated").

Mr. Harris's circumstances hardly resemble *Gilchrist*.  Medical records show that on June 3, 2020, Mr. Harris reported no breathing problems.  *See* Doc. 161 at 15 (citing BOP Assessment of Wesley L. Harris (June 3, 2020) ("Inmate denies:  shortness of breath; breathing difficulties; any respiratory issues . . . .")).  The scant information about Mr. Harris's asthma limits the court's ability to assess the current state of his condition and determine whether his asthma falls within the CDC's "moderate-to-severe" category that *might* increase the risk for severe illness

from COVID-19.  The court concludes that Mr. Harris has not shown that his asthma condition

falls within the statutory bounds for compassionate release.

> ### 2. Whether Mr. Harris Being Black During the COVID-19 Pandemic is an "Extraordinary and Compelling Reason" that Justifies a Sentence Modification Under § 3582(c)(1)(A)(i)

Mr. Harris also asserts that being a Black person "places him at greater risk of severe

illness and complications from COVID-19."  Doc. 158 at 12.  He supports this assessment of his

individual risk through citations to CDC data showing that COVID-19 has affected

disproportionately racial and ethnic minority groups.  *See id.* at 8 (citing CDC, COVID-19 Cases,

Hospitalization, and Death by Race/Ethnicity (Aug. 8, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/downloads/covid-data/hospitalizationdeath-by-race-

ethnicity.pdf).

The CDC notes that "inequities in social determinants of health that put racial and ethnic

minority groups at increased risk of getting sick and dying from COVID-19 include"

discrimination, healthcare access and utilization, occupation, gaps in education, income, wealth,

and housing.  CDC, Health Equity Considerations and Racial and Ethnic Minority Groups

(updated July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-

equity/race-ethnicity.html (last visited Dec. 3, 2020).  "These factors and others are associated

with more COVID-19 cases, hospitalizations, and deaths in areas where racial and ethnic

minority groups live, learn, work, play, and worship.  They have also contributed to higher rates

of some medical conditions that increase one's risk of severe illness from COVID-19."  *Id.*

(citations omitted).

But Mr. Harris has not explained how this COVID-19 patient data and inequities in social determinants of health show that *he* faces more risk from COVID-19 because he is a Black American.

Our court has reached similar conclusions about the issue whether an inmate's "status as a 'minority male' renders him particularly susceptible to COVID-19 and increases his risk of harm in the event that he contracts the virus." *United States v. Lamas*, No. 12-20119-02-JWL, 2020 WL 5593839, at *2 (D. Kan. Sept. 18, 2020) (collecting cases). In *Lamas*, this court held that defendant's status as "a minority male does not constitute a risk factor for COVID-19 in the same way that an underlying medical condition does." *Id.* (concluding that defendant "has simply not shown that he bears an increased risk of serious medical harm" and denying defendant's motion under § 3582(c)(1)(A)). Likewise, in *United States v. Jackson*, our court rejected a Black-American defendant's "argument that [his] race, in and of itself, places [him] at an increased risk of harm." *United States v. Jackson*, No. 05-20018-01-JWL, 2020 WL 5231317, at *2 (D. Kan. Sept. 2, 2020) (citations omitted) (holding defendant failed to show that extraordinary and compelling reasons warrant compassionate release); *see also United States v. Young*, No. CR 10-20076-01-KHV, 2020 WL 6384362, at *5 (D. Kan. Oct. 30, 2020) ("While African-Americans have suffered a disproportionately high rate of hospitalizations and deaths from COVID-19 compared to the overall population, race itself generally is not considered a risk factor."). *But see United States v. Triplett*, No. 02-40131-JAR, 2020 WL 5802120, at *3–4 & n.30 (D. Kan. Sept. 29, 2020) (discussing CDC data about COVID-19 infection rates by age and race and holding that hypertensive "fifty-one-year-old African American male" defendant recovering from COVID-19 infection "may have some risk factors relating to COVID-19," but nonetheless concluding that "extraordinary and compelling reasons do not exist" given

defendant's "lack of complications after testing positive and the possibility of developing some degree of immunity").

Mr. Harris criticizes the conclusions of courts who have rejected race as an extraordinary and compelling reason under § 3582(c)(1)(A).  He argues that they are "based on a flawed view that the studies only show that African-Americans are more likely to have underlying health issues that make them more susceptible from COVID."  Doc. 158 at 9 (citing *United States v. Green*, No. 05-205, 2020 WL 3642860, at *4 (W.D. Pa. July 6, 2020)).  The court construes Mr. Harris's argument and citation of *Green* to suggest that *Green*'s analysis of the relationship between race and COVID-19 severity is representative of the numerous district court opinions that have concluded that race does not qualify as an "extraordinary and compelling" reason under § 3582(c)(1)(A).

But Mr. Harris jabs at *Green* without good reason.  His characterization of the case's analysis is unfairly incomplete.  *Green* identifies four factors that contribute to COVID-19-related disparities across race—and three are unrelated to underlying health conditions.  *Green* reasons that it "is unclear . . . whether race is an independent risk factor or whether the adverse outcomes are caused by other factors such as living conditions (such as population density), work conditions (including service in essential industries), lack of access to health care or the prevalence of other underlying medical conditions."  *Green*, 2020 WL 3642860, at *4.  Mr. Harris's motion neglects to mention the other three factors that *Green* identifies as relevant to the relationship between race and COVID-19 outcomes.  *See* Doc. 158 at 9.

To support its analysis, *Green* cited CDC guidance about the risks that racial and ethnic minorities face during the COVID-19 pandemic.  *Green*, 2020 WL 3642860, at *4 (citing CDC, Health Equity Considerations and Racial and Ethnic Minority Groups,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last visited June 23, 2020)). This is the same CDC guidance that Mr. Harris cites to support his own argument. *See* Doc. 158 at 8. *Green*'s analysis remains consistent with the CDC's recent guidance on this topic. *See* CDC, COVID-19 Hospitalization and Death by Race/Ethnicity (updated Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html ("Race and ethnicity are risk markers for other underlying conditions that affect health including socioeconomic status, access to health care, and exposure to the virus related to occupation[.]") (last visited Dec. 3, 2020).

But Mr. Harris claims that *Green*'s conclusion—that it remains unclear "whether race is an independent risk factor"—is wrong because that conclusion "is not what the data shows." Doc. 158 at 9. He supports his argument by quoting a study that evaluated the association between race and COVID-19 mortality. *See id.* (citing Ladan Golestaneh, *et al.*, *The association of race and COVID-19 mortality*, E-Clinical Medicine: A publication of the Lancet (July 15, 2020), https://www.thelancet.com/action/showPdf?pii=S2589-5370%2820%2930199-1). Mr. Harris notes that this study found that "the usual explanations of clinical comorbidities and easily available socioeconomic factors" fail to explain fully COVID-related racial disparities. *Id.* (quoting Golestaneh, *The association of race and COVID-19 mortality*).

The court accepts the motion's invitation to consider this study carefully. And after parsing its analysis carefully, the court concludes that the study provides little support to Mr. Harris's argument here. If fact, the study's findings—which its authors dub a "paradox"—undermine Mr. Harris's argument.[2]

---

[2]      While litigation about the novel coronavirus has injected a substantial dose of medical literature into the court's work, the court acknowledges its limited subject matter expertise in medicine, public

The court identifies four reasons why this study does not render the analysis of cases like *Green* as a flawed one.

*First*, *Green*'s characterization of the relationship between race and COVID-19 outcomes as "unclear" is consistent with the study's findings.  *Compare Green*, 2020 WL 3642860, at *4 ("It is unclear . . . whether race is an independent risk factor . . . ."), *with* Golestaneh, *The association of race and COVID-19 mortality* at 7 ("We cannot be sure of its biologic significance[.]").

*Second*, the study "did not find any difference in mortality for Blacks compared to Whites" in "the hospitalized COVID positive cohort[.]"  *Id.* at 6.  The study noted that this finding "is similar to other reports of hospitalized COVID + cohorts."  *Id.* (citations omitted).

*Third*, the study considered mortality of patients *during* the COVID-19 pandemic, not merely mortality of COVID-19 positive patients.  *See id.* at 5–6.  The study found "that the parent population of *all* ambulatory Black patients engaged in care did suffer disproportionate higher mortality *in the COVID period* which [the authors] deductively attributed to the entry of COVID into our population."  *Id.* (emphasis added).  The study observed that Black persons not hospitalized with the virus causing COVID-19 had a disproportionately high mortality rate *during* the COVID-19 pandemic.  *See id.* at 5.  The authors hypothesized that Black patients included in this study suffered "a larger number of 'non-biologic' COVID related deaths."  *Id.* at 6. These "COVID related deaths" include deaths of people *without* the coronavirus.

The study's race-related findings involve these racially disproportionate "non-biologic" deaths due to the pandemic's possible influence on the hospitalized population, the health care system, and the quality of patient care.  *See id.* at 5–6.  This observation differs substantially

___
health, and epidemiology.  Accordingly, the court welcomes future filings that elect to support their arguments with citations to complex medical research to provide further context for their arguments.

from a finding that certain patients suffer worse medical outcomes after contracting the virus that causes COVID-19.  *See id.* at 6 (discussing this "paradox").

The court understands Mr. Harris's motion to rest on his concern about his increased risks for complications if he were to contract the virus that causes COVID-19.  *See* Doc. 158 at 12 ("Mr. Harris's race, in addition to his asthma, places him at greater risk of severe illness and complications from COVID-19.").  His motion does not argue that compassionate release is justified on the basis of Mr. Harris's risk of "non-biologic" COVID-related harm that this study finds correlates partially with race.

*Fourth*, to the extent that the study lends any support for racially-linked increased health risk from becoming sick with the virus that causes COVID-19, the study offers several explanations for the "failure of comorbidity adjusters to explain the mortality difference" between Black patients and white patients.  *Id.* at 5–6.  These proffered reasons relate to the sorts of social determinants of health that the CDC explains and *Green* considered.[3]  This study thus does not undermine the validity of *Green*'s analysis, as Mr. Harris suggests.  His motion emphasizes that "the usual explanations of clinical comorbidities and easily available socioeconomic factors" do not explain fully the racial disparities observed.  Doc. 158 at 9.  But

---

[3]     *First*, the study's authors suggest that "insensitivity of [their] comorbidity metrics to the true Black comorbidity burden" may explain the residual mortality difference their study identified. Golestaneh, *The association of race and COVID-19 mortality* at 5.  They reason that since "the determination of comorbidity is dependent upon access to the health care delivery system to make diagnoses and measure relevant laboratory tests[,] . . . [d]ecreased healthcare access from whatever cause could thereby reduce the detection of comorbidities and weaken [the study's] comorbidity construct to fully explain the observed mortality."  *Id.  Second*, the authors propose that the residual mortality gap may occur because "the meaning of comorbidity in minority populations might be different."  *Id.* at 6.  They reason that a "comorbid diagnosis in Blacks might be more severe than in Whites because it might be functionally disproportionately unaddressed.  Thus, while comorbidity might present as a billing entity with an ICD10 diagnosis its failure to be adequately remediated might be more of a persistent biologic threat to the Black patient than to his/her White counterpart."  *Id.*  One can explain both reasons by considering inequities in the social determinants of health discussed above—the determinants on which *Green*'s analysis relies.  *See Green*, 2020 WL 3642860, at *4.

the study explicitly identifies other socioeconomic or otherwise non-biological factors that may explain that gap.

The court thus concludes that Mr. Harris's motion fails to show that *Green*'s analysis on this issue, or the analysis of our court's other cases discussed above, rely on a flawed reading of the data. Nor does the motion show that the fact that Mr. Harris is a Black person during the COVID-19 pandemic presents an extraordinary and compelling reason under § 3582(c) that warrants modifying his sentence.

### C. Mr. Harris's Conduct Since Sentencing

The court notes that Mr. Harris shares evidence of his "tremendous changes" and his efforts to "take[ ] advantage of the programs set in place for the willing inmate to use as a catalyst for change." Doc. 158-3 at 1. He attaches as exhibits to his motion "certificates of completion from programs that [he] felt would be beneficial to [his] success" and equip him "with the tools to become a productive member of society." *See id.*; *see also* Doc. 158-5 at 1–11. These positive changes are pieces of information that the court might consider when applying the § 3553(a) sentencing factors to a proposed sentence modification. *See* 18 U.S.C. § 3553(a)(1) ("history and characteristics of the defendant"). But Congress has authorized the courts to modify a sentence under 18 U.S.C. § 3582(c)(1)(A)(i) only where qualifying "extraordinary and compelling reasons" exist. Because Mr. Harris's medical conditions do not meet that standard, the court lacks subject matter jurisdiction to consider the motion. The court is thus unable to reach the § 3553(a) analysis that would allow the court to consider, among other things, Mr. Harris's admirable commitment to education and personal growth while incarcerated. This restriction doesn't reduce the intrinsic value of Mr. Harris's accomplishments. It means, however, that they cannot provide a reason to grant the relief he seeks.

## IV.   Conclusion

Mr. Harris offers two arguments to justify his compassionate release under § 3582.  But his conditions, taken alone and together, do not qualify as extraordinary and compelling under the statute.  The court thus lacks subject matter jurisdiction and must dismiss the motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Wesley LaVern Harris's Motion to Reduce Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 158) is dismissed without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

**Dated this 4th day of December, 2020, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**